**Oreatha POWERS, etc., Plaintiff,**

v.

**CSX TRANSPORTATION, INC., et al., Defendants.**

**No. CIV.A.99–0326–RV–S.**

United States District Court, S.D. Ohio, Southern Division.

Jan. 29, 2002.

Charles R. Godwin, Timothy J. Godwin, Atmore, AL, for Plaintiff.

Brian P. McCarthy, Jerry A. McDowell, Todd Preston Resavage, McDowell Knight Roedder & Sledge, L.L.C., Lawrence M. Wettermark, Thomas O. Gaillard, III, Galloway, Smith, Wettermark & Everest, LLP, Mobile, AL, Jim R. Ippolito, Jr., Gilda Branch Williams, T. Dudley Perry, Jr., Robert M. Alton, III, Department of Transportation State of Alabama Legal Division, Montgomery, AL, for Defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

VOLLMER, Senior District Judge.

■ This matter is before the Court on several defense motions for summary judgment: that of CSX Transportation, Inc. ("CSX"), G.A. Owens and C.M. Cooper (collectively; "the CSX defendants"), (Doc. 138); that of the City of Atmore ("the City"), (Doc. 141); and that of the Alabama Department of Transportation ("ADOT") and Dykes Rushing. (Doc. 133). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 134–35, 137–39, 142–43, 149–50, 155, 158, 165), and the defendants' motions are now ripe for resolution.[1] After careful consideration of the parties' briefs and of those portions of their evidentiary submissions specifically cited in their briefs,[2] the Court concludes that

---

1. The City's motion for relief from Rule 7.1, (Doc. 144), is granted.

2. As reflected in CSX's first motion to strike, the plaintiff has dumped into the record over 500 pages of deposition testimony yet cited to fewer than 100 pages. (Doc. 156 at 3). The plaintiff may not, by this simple expedient, shift to the Court the burden of identifying evidence supporting her position. *E.g., Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672

(10th Cir.1998)("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable ...."). *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1, 8 Fed.Appx. 835 (9th Cir. 2001)("While pretext evidence may have been buried in [the plaintiffs] 242 page deposition, 'a district court is not "required to comb the

ADOT's and Rushing's motion for summary judgment is due to be granted in its entirety and that the motions for summary judgment filed by the other defendants are due to be granted as to the plaintiffs federal claims. The Court further concludes that the plaintiffs supplemental state law claims are due to be dismissed pursuant to 28 U.S.C. § 1367(c).[3]

## BACKGROUND

Terrence Terrell Rogers died early on November 13, 1997, several hours after the vehicle he was driving was struck by a train owned and operated by CSX. Rogers was struck as he attempted to traverse the CSX track at the Martin Luther King, Jr. crossing (the "MLK crossing") in Atmore, Alabama. The plaintiffs second amended complaint contains eight counts, as follows:

- Count One: Negligence
- Count Two: Wantonness
- Count Three: Substantive Due Process
- Count Four: Equal Protection
- Count Five: 42 U.S.C. § 2000d (Title VI)
- Count Six: Thirteenth Amendment
- Count Seven: 42 U.S.C. § 1982
- Count Eight: 42 U.S.C. § 1985(3)

(Doc. 41). CSX and the City are named as defendants under all eight counts. ADOT and Rushing are named as defendants only under Counts Three through Eight, while Owens and Cooper are named as defendants only under Counts One and Two. Rushing is sued in both his official and individual capacities. *(Id.)*.

record to find some reason to deny a motion for summary judgment." ' ")(quoting earlier Ninth Circuit cases); *Lawson v. Sheriff of Tippecanoe County,* 725 F.2d 1136, 1139 (7th Cir.1984)(where the plaintiffs deposition was in evidence but she did not point out to the court where it created a genuine issue of material fact, "[t]he judge was not obliged to comb the record for evidence contradicting the defendant's affidavit"); see *also* Local

## CONCLUSIONS OF LAW

The Court has subject matter over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). Venue is proper pursuant to 28 U.S.C. § 1391(b).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied her responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994,

Rule 7.2. Thus, the Court's review of the record is restricted to those exhibits, and those deposition pages, specifically cited by the parties.

3. The CSX defendants' request for oral argument, (Doc. 140), is denied. The defendants' motions to strike, (Docs. 156, 158, 159, 167), are denied. The motion for sanctions filed by ADOT and Rushing, (Doc. 160), is denied.

999 (11th Cir.1992) (internal citations and quotations omitted).

## I. Federal Claims.

### A. Substantive Due Process.

Count Three of the second amended complaint alleges that, despite actual or imputed knowledge of the dangerousness of the MLK crossing, the defendants "consciously refused to prevent the automobile/train collision which killed Plaintiffs decedent by refusing to install crossing gates and flashing light signals at the MLK crossing prior to said collision" and thereby "affirmatively placed members of a suspect class, including Plaintiffs decedent, in a dangerous position which they would not otherwise have faced." The complaint continues that the defendants installed active warning devices in the City "in an arbitrary and discriminatory manner displaying callous and deliberate indifference toward the City of Atmore's black community in which Plaintiff and her son resided." The complaint concludes that the defendants' "conscious and intentional decision to omit installation of crossing arms and flashing light signals at the MLK crossing when they had an affirmative duty to do so deprived Plaintiffs decedent of his constitutionally protected life interest" in violation of the Fourteenth Amendment's guarantee of substantive due process. (Doc. 41 at 20–22).

The CSX defendants and the City have moved for summary judgment as to Count Three and properly supported their motions. (Doc. 138 at 47–49; Doc. 142 at 15–29).[4] The plaintiff, who has failed to

respond in any meaningful way to the defendants' motions, has effectively abandoned her claim for violation of the substantive due process clause.[5] At any rate, and as explained below, the plaintiff has no such claim.

"As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). That is, the Due Process Clause "forbids the State itself" to deprive individuals of life, liberty or property without due process of law, *id.* at 195, 109 S.Ct. 998, but it does not "ensure that the State protect[s] them from each other." *Id.* at 196, 109 S.Ct. 998.

Rogers was deprived of his life by a collision with a train owned and operated by CSX. While the plaintiff alleges that CSX was a state actor for purposes of installing active warning devices at the crossing, (Doc. 41 at 21), it is uncontroverted that CSX was purely a private actor with respect to its operation of its train on November 12, 1997. Rogers was thus deprived of his life by "private violence" which, under *DeShaney,* generally will not support a substantive due process claim. Neither of the two exceptions to the general rule applies here.

First, the Constitution may require the government affirmatively to protect an individual from private violence when the individual is in custody. 489 U.S. at 199–200, 109 S.Ct. 998. Rogers, of course, was

---

4. Count Three was previously dismissed as to ADOT and Rushing on other grounds. (Doc. 52).

5. *E.g., Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.)("[G]rounds alleged in the complaint but not relied upon in summary judgment are

deemed abandoned."), *cert. denied,* 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *cf. Malowney v. Federal Collection Deposit Group,* 193 F.3d 1342, 1345 (11th Cir.1999)(issues not clearly raised and argued on appeal are deemed abandoned), *cert. denied,* 529 U.S. 1055, 120 S.Ct. 1558, 146 L.Ed.2d 463 (2000).

not in custody as he drove his vehicle across the track. Any theory that a "special relationship" short of custody could support an affirmative duty to protect individuals from private harm was laid to rest in *Collins v. City of Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). See *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir.1999)("After *Collins*, it appears the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships . . . .").

■ Second, *the DeShaney Court* noted that an affirmative duty to protect individuals not in custody from private dangers could not arise where the government "played no part in their creation nor did . . . anything to render [the individual] any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. 998. Some courts have read this obscure dicta to suggest that the converse is also true, so that a government may take on an affirmative duty to protect a non-custodial individual when the government creates the danger or renders the individual more vulnerable to a danger created by others. The Eleventh Circuit initially concluded that this portion of *DeShaney* was consistent with the circuit's "special danger" analysis for identifying duties owed to individuals not in custody. *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 354–56 (11th Cir.1989). More recently, however, the Eleventh Circuit has recognized that the "special danger"

analysis "has been supplanted"[6] by *Collins*. *White v. Lemacks*, 183 F.3d at 1258. "Under *Collins*, government officials violate the substantive due process rights of a person not in custody *only* by conduct 'that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* (emphasis added)(quoting *Collins v. City of Harker Heights*, 503 U.S. at 128, 112 S.Ct. 1061); *accord County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)(*Collins* held that the substantive due process clause "is violated by executive action *only*" when it is arbitrary or conscience shocking)(emphasis added)!

■ Thus, the plaintiff can pursue a substantive due process claim only if the defendants' conduct was "arbitrary, or conscience shocking, in a constitutional sense." This standard is to be "narrowly interpreted and applied," *White v. Lemacks*, 183 F.3d at 1258, and "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. at 846, 118 S.Ct. 1708. Among other restrictions, conduct that is not undertaken with a deliberate intent to injure will seldom satisfy the standard, and negligence can never satisfy it. *Id.* at 849, 118 S.Ct. 1708. Moreover, there is a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces," which myriad

---

**6.** The plaintiff could not satisfy the "special danger" test even if it had survived *Collins*. The "danger" in which the government places the individual must be a special position of danger "distinguishable from that of the general public." *Mitchell v. Duval County School Board*, 107 F.3d 837, 839 (11th Cir.1997). Even assuming that the City and CSX created the dangerous crossing (and that CSX was a state actor in doing so), the danger Rogers confronted was the same one facing all mo-

torists traversing the MLK crossing from the south. Nor did the defendants' failure to install approved active warning devices render Rogers "more vulnerable" to danger than if active warning devices had never been approved. *See DeShaney v. Winnebago County*, 489 U.S. at 201, 109 S.Ct. 998 (the government does not worsen the individual's position when it returns him to the same dangerous condition from which it had previously removed him).

choices are inappropriate for federal constitutional second-guessing. *Collins v. City of Harker Heights*, 503 U.S. at 128–29, 112 S.Ct. 1061.

Here, the plaintiff does not even allege that the defendants intended to injure or kill Rogers. Although she alleges that the defendants acted with "deliberate indifference," (Doc. 41 at 22), "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *County of Sacramento v. Lewis*, 523 U.S. at 850, 118 S.Ct. 1708.

The defendants' alleged failure to install active warning devices promptly after their authorization, even if accompanied by deliberate indifference to Rogers' constitutional rights, does not shock the conscience so as to support a substantive due process claim. The plaintiff herself insists that the delay in upgrading the Atmore crossings was caused by CSX's failure to allocate sufficient resources to the task, (Doc. 150 at 11–13), and "when someone not in custody is harmed because too few resources were directed to their safety and protection, that harm will seldom, if ever, be cognizable under the Due Process Clause." *White v. Lemacks*, 183 F.3d at 1258.

Neither the plaintiff nor the Court's independent research has disclosed any case suggesting the viability of a claim under the substantive due process clause against a government for failing to improve its roadways. On the contrary, the Fifth Circuit has rejected the notion that a government's failure to protect its citizenry by removing a drunken driver from the roads states a claim for violation of substantive due process. *Saenz v. Heldenfels Brothers, Inc.*, 183 F.3d 389 (5th Cir.1999).

Eleventh Circuit precedent rejecting substantive due process claims further illustrates how stringent the standard is and how far the plaintiffs claim falls short. *See White v. Lemacks*, 183 F.3d at 1254, 1258 (county and its sheriff did not violate the plaintiffs' substantive due process rights by requiring them to provide medical services in the county jail without adequate protection or means of escape, so that they were "brutally beaten" by an inmate being held on charges of aggravated assault).

The only circumstance alleged by the plaintiff that could possibly shock the conscience is that the defendants delayed upgrading the MLK crossing because of the race of the populace it predominantly serves. It is questionable whether a claim of race discrimination may be pursued by resort to the nebulous, untethered standards of the substantive due process clause rather than within the familiar confines of the equal protection clause. *See United States v. Lanier*, 520 U.S. 259, 272, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *accord County of Sacramento v. Lewis*, 523 U.S. at 842, 118 S.Ct. 1708. Even if such a claim is possible, as discussed below the plaintiff has failed to demonstrate a genuine issue of material fact as to the existence of a racially discriminatory motivation.

In summary, the plaintiffs claim under the substantive due process clause is due to be dismissed.

**B. Thirteenth Amendment.**

Count Six of the second amended complaint alleges that the defendants' fail-

ure to install approved active warning devices at the MLK crossing constituted a "badge and incident of slavery" in violation of the Thirteenth Amendment. (Doc. 41 at 29–30). As this Court has already concluded, the Thirteenth Amendment furnishes no private cause of action in the circumstances alleged. (Doc. 52). Accordingly, the plaintiffs Thirteenth Amendment claim is due to be dismissed.

### C. Other Race Discrimination Claims.

▮ Each of the plaintiffs remaining federal claims requires her to prove that the defendants acted with a racially discriminatory purpose in delaying installation of active warning devices at the MLK crossing. *E.g., Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)(equal protection clause); *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 1516, 149 L.Ed.2d 517 (2001)(Title VI); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616–17, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987)(Section 1982); *Griffin v. Breckenridge*, 403 U.S. 88, 102 n. 10, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)(Section 1985(3)); *accord In re: Employment Discrimination Litigation*, 198 F.3d 1305, 1319 (11th Cir. 1999)(equal protection clause); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1202 (11th Cir.1999)(Title VI); *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir.1994)(Section *1982); Save Our Cemeteries, Inc. v. Archdiocese of New Orleans*, 568 F.2d 1074, 1078 (5th Cir.1978)(Section 1982); *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1337 (11th Cir.1999)(Section 1985(3)). The defendants have pointed out that the plaintiff cannot create a genuine issue of material fact as to such intent, and the plaintiff has failed to identify evidence of a racially discriminatory intent sufficient to withstand the defendants' motions for summary judgment.

Claims of intentional race discrimination proceed on the theory that the defendant has treated one person or group less favorably than others because of their race. In this case, the plaintiff alleges that blacks were treated less favorably than whites in the provision of active warning devices. In particular, the plaintiff complains that, of the four City crossings authorized for installation of active warning devices between November 1995 and March 1996, the three allegedly serving a predominantly white population had installation completed or at least begun before similar improvements were installed at the MLK crossing, which allegedly serves a predominantly black area north of the crossing.

It is uncontroverted that installation began on each of the three "white" crossings before installation began at the MLK crossing. Installation at the Second Avenue and Wilson Avenue crossings was also completed before installation began at the MLK crossing. Installation began at the Deas Street crossing before the MLK crossing, but installation was completed at the MLK crossing before it was completed at the Deas Street crossing.

This sequence, standing alone, is insufficient to raise an inference that the sequence was a product of purposeful race discrimination. This is especially so when the actual timing of installation is considered:

| Crossing | Start of Work | Signals in Service |
| --- | --- | --- |
| Wilson Avenue | July 30, 1997 | September 26, 1997 |
| Second Avenue | September 23, 1997 | November 8, 1997 |
| Deas Street | October 26, 1997 | January 9, 1998 |

This chart reflects that installation at the three "white" crossings began only 105, 50 and 17 days prior to the subject collision, a time gap insufficient to demonstrate a meaningful difference in the time of installation, especially given the physical necessity of non-simultaneous installation.[8]

In her perfunctory, two-page argument, (Doc. 150 at 30–32), the plaintiff insists that there are other indicia of the defendants' racially discriminatory intent, but nothing she cites can support a reasonable inference of race discrimination.

Most of the plaintiffs sparse argument is addressed to CSX. It is uncontroverted that Roger Owens, CSX's director of highway crossing systems, made the decision as to the relative scheduling of the four City grade crossing improvements. (Owens Deposition at 114). It is further uncontroverted that Owens lives in Jacksonville, Florida and that he had no idea of the racial composition on either side of any of the City crossings when he scheduled the grade crossing improvements within the City. (Owens Deposition at 119–20). The plaintiff has offered no reason to discredit Owens' testimony, which proves fatal to her case. *E.g., Trotter v. Board of Trustees,* 91 F.3d 1449, 1456–57 n. 10 (11th Cir.1996)(the evidence supported a finding that the decisionmaker did not know the

race of the plaintiffs "and thus could not have intentionally discriminated").[9]

Even if the plaintiff had some evidence that Owens was aware of the City's racial demographics when he devised the schedule, she has identified no evidence sufficient to create a fact issue as to whether CSX purposefully improved the MLK crossing last because of race. This failure is not for want of trying, as the plaintiff argues: (1) that CSX violated its own practice of improving each crossing in the order of authorization by ADOT;[10] (2) that the MLK crossing was "of the highest priority" since June 1993 and so should not have been improved last; (3) that the MLK crossing was originally scheduled to be improved simultaneously with the Second Avenue crossing but that this order was mysteriously changed; (4) that CSX illogically shifted its crew from Second Avenue to Deas Street, far to the west, rather than to MLK, the next crossing to the east; and (5) that CSX inexplicably interrupted its work at Deas Street and moved to MLK shortly after the subject collision. None of these arguments will bear the weight the plaintiff assigns them.

First, the plaintiff has offered no evidence of a "practice" of upgrading each crossing strictly in the order of authorization from ADOT. On the contrary, Owens

---

7. (Doc. 142 at 33).

8. It is uncontroverted that a single crew performed the installations, (Doc. 150 at 12–13), so that simultaneous installation at all four crossings was not possible. Thus, some sequence of installation had to be followed.

9. While the plaintiff suggests that the name "Martin Luther King" connotes a black population, the MLK crossing is shown as the "Eighth Avenue" crossing in the defendants'

paperwork. (E.g., Doc. 149, Exhibits 3–11). Apparently the earliest reference to the "MLK" crossing is in April 1997, *after* Owens had determined the schedule. (Owens Deposition at 85; Doc. 149, Exhibit 12).

10. ADOT issued authorization for the MLK crossing on November 29, 1995; for the Second Avenue crossing on December 4, 1995; for the Deas Street crossing on December 11, 1995; and for the Wilson Avenue crossing on March 27, 1996. (Doc. 142 at 33).

testified that the scheduling of grade crossing improvements within a community is governed by business concerns such as the impact each crossing has on nearby crossings and on the availability of materials to complete the improvement, not the order of authorization. (Owens Deposition at 73, 85–86, 114–15).[11]

Second, the plaintiff has not explained who gave or concurred in a designation of "highest priority," whether the other Atmore crossings also carried such a designation, what the significance of such a designation might be, or whether CSX or Owens was even aware of the designation. In short, the plaintiff has failed to demonstrate the relevance of a "highest priority" designation.

Third and fourth, Owens testified that he moved MLK to last because of a design change.[12] Second Avenue and MLK were designed as, and sent to ADOT for approval as, stand-alone upgrades—the normal practice, since it allowed CSX to proceed with each crossing improvement as submitted should ADOT authorize one crossing upgrade but not the other. After ADOT authorized both upgrades in late 1996, the MLK design was changed to reflect that it would share a DAX housing with Second Avenue.[13] Owens moved MLK to last on the schedule to ensure that this design change was accomplished before the crew began construction. Owens further testified that the control houses for each crossing are wired for upgrade in Savannah and

shipped on a just-in-time basis. Because Owens had shifted the schedule to allow time for the design change at MLK, the housing arrived for Second Avenue, Deas Street and MLK in that order, and installation was undertaken in that order. (Owens Deposition at 88, 92–93, 95). The plaintiff has not identified any evidence to contradict Owens' testimony or advanced any argument for ignoring it.

Fifth, Owens testified without contradiction that the crew left Deas Street because progress there was stalled since CSX's right-of-way maintenance crew had not installed necessary insulated joints south of the crossing. Since the housing for MLK had arrived, the crew could be productive at MLK but not at Deas Street. (Owens Deposition at 97). Perhaps more fundamentally, the plaintiff offers no support for her counterintuitive proposition that CSX, by installing grade crossing improvements following a fatality, evinced a racially discriminatory intent *not* to install the improvements.

As noted, the alleged discrimination in this case is that the MLK crossing was the last of four City crossings to receive active warning devices. It is uncontroverted that CSX alone, to the exclusion of the City, ADOT and Rushing, established the order in which the four crossings were improved. (Owens Deposition at 118, 122).

The plaintiffs only response is that Rushing did not know the identity of his

---

**11.** While the testimony on which the plaintiff relies does reflect that Owens attempted to schedule projects in the order authorized, it also reflects that he considered all crossing improvements within a small geographic area as a single project for purposes of scheduling, for the business reasons set forth in text. (Owens Deposition, at 73, 129–30).

**12.** Owens testified that, of the four crossings, Wilson Avenue proceeded first because it was adjacent to three existing signals within the City that would be affected by the upgrade

and because its control housing was already wired, making it the first crossing ready to proceed. *(Id.* at 73, 94). The plaintiff does not argue that Wilson Avenue was improved first because of race but because of a race-neutral desire "to improve [CSX's] performance statistically." (Doc. 150 at 7, 13).

**13.** A downstream auxiliary unit, or "DAX," measures the speed of an approaching train and by impulse instructs the automatic gate when to lower. (Owens Deposition at 93).

Title VI designee and that the City refused to provide a 30(b)(6) deponent regarding the progress and order of installation. (Doc. 150 at 31). Without evidence that ADOT, Rushing or the City influenced CSX's order of installation, these arguments are futile. At any rate, the plaintiff has not explained how ignorance of one's Title VI designee could be proof of purposeful race discrimination, any more than could ignorance of one's human resources manager. The Court finds no indication that the plaintiff ever challenged the City's 30(b)(6) designation in Court and, in any event, a discovery dispute without more does not translate into evidence of race discrimination.

In summary, for lack of any genuine issue of material fact as to racially discriminatory intent, the plaintiffs claims for violation of the equal protection clause, Title VI, Section 1982 and Section 1985(3) are due to be dismissed.

### D. State Claims.

■ Count One of the second amended complaint accuses CSX, Cooper, Owens and the City of negligence in fifteen different respects. Count Two accuses the same defendants of wantonness in the same respects. (Doc. 41 at 6–19). The Court concludes that it is unnecessary to rule on the defendants' motions for summary judgment to the extent they address those aspects of Counts One and Two still in the case.[14]

■ First, the Court has no independent subject matter jurisdiction over the plaintiffs state claims[15] and, pursuant to 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over such claims after it "has dismissed all claims over which it has original jurisdiction." See, e.g., *Bowens v. City of Atmore*, 171 F.Supp.2d 1244, 1260 (S.D.Ala.)(collecting Eleventh Circuit cases favoring relinquishment of supplemental jurisdiction when all federal claims are dismissed before trial), *aff'd*, 275 F.3d 57 (11th Cir. 2001).

Moreover, pursuant to Section 1367(c)(1), the Court may decline to exercise supplemental jurisdiction if the state claim "raises a novel or complex issue of State law." ADOT's notice to CSX to proceed with installing active warning devices at the MLK crossing was dated November 29, 1995, but CSX did not complete installation until December 7, 1997. In paragraph N of Counts *One* and Two, the plaintiff alleges that CSX negligently or wantonly failed to install the active warning devices within a reasonable time after their authorization. (Doc. 41 at 12, 19). The Court concludes that the "novel or complex" standard is met at least with respect to the plaintiffs allegations under paragraph N.[16]

CSX argues that, as a matter of Alabama law, the plaintiff has no claim for negligent or wanton delay. (Doc. 138 at 26–30; Doc. 155 at 2–7).[17] *CSX's argu-*

14. Prior to removal to this Court, the state court ruled that those aspects of Counts One and Two based on excessive speed (presumably, paragraphs M, 0 and part of D) were preempted by federal law. (Doc. 43 at 9 n. 4). The state court also found the plaintiffs claim under paragraph C for failure to install active warning devices to be preempted, (id. at 2), a ruling with which this Court concurred on the plaintiff's motion to reconsider. (*Id.* at 9–15).

15. Diversity jurisdiction is lacking because the plaintiff, Rogers, Owens and Cooper were at all relevant times resident citizens of Alabama. (Doc. 41 at 3; Doc. 46 at 2).

16. By addressing only paragraph N, the Court does not suggest that the analysis and result with respect to the plaintiffs other state law claims is clear.

17. In two exhaustive orders, the Court has thoroughly discredited CSX's unsupportable position that federal law preempts any Alabama cause of action for negligent or wanton delay. (Docs. 43, 49). Nevertheless, CSX continues to insist that the plaintiffs claim is

ment proceeds as follows: (1) while tort duties may arise from statute, regulation, common law or contract, the only possible source of a duty to timely install active warning devices is CSX's contract with ADOT; (2) while Alabama law recognizes that misfeasance of a contract will support a tort duty, nonfeasance of a contract will not; (3) CSX is guilty at most of nonfeasance; (4) the scope of any tort duty arising by contract can extend no further than the contractual duty itself, and since the contract does not provide any deadline for installing active warning devices, CSX cannot be in breach of any such contractual duty.

The Court assumes for present purposes that the first article of CSX's argument is correct, so that any tort duty on which the plaintiff relies must spring from the CSX–ADOT contract. However, the Court has serious reservations concerning the remainder of CSX's argument.

 While the general rule in Alabama is that "a mere failure to perform a contractual obligation is not a tort," *Barber v. Business Products Center, Inc.*, 677 So.2d 223, 228 (1996), Alabama apparently recognizes exceptions to this rule. Thus, for example, in *Taylor v. Baptist Medical Center, Inc.*, 400 So.2d 369 (Ala.1981), when a physician who had contracted to provide the plaintiff with prenatal, delivery and postnatal care failed to attend during the plaintiffs labor and delivery, the Court

held that the plaintiff could pursue an action for negligent failure to attend. *Id.* at 372, 374. Similarly, in *Western Union Telegraph Co. v. Jackson*, 163 Ala. 9, 50 So. 316 (1909), where the defendant failed to timely deliver a telegram pursuant to contract, the recipient could maintain an action for "negligent delay" in the delivery of the message. *Id.* at 318. The rationale and scope of these exceptions remains unclear and unaddressed by the parties.

It is also unclear that CSX's performance under its contract should properly be characterized as "nonfeasance" and not "misfeasance." CSX charged for its engineering work prior to physical installation, (Doc. 135, Exhibit 4A), suggesting that this work was part of the contract. Also, as discussed in the preceding section, it is uncontroverted that, following authorization, CSX made a design change and ordered and received a control housing wired to handle the upgrade. There would thus appear to be an argument that CSX had begun performance under its contract prior to the subject collision.[18]

It is further not clear that the nonfeasance-misfeasance distinction obtains when the plaintiff is a third party and a stranger to the contract. According to Professor Prosser, on whom CSX relies, "the distinction between misfeasance and nonfeasance is not a good basis for establishing limits to liability to third parties resulting from

preempted. (Doc. 138 at 28–29; Doc. 155 at 6). Similarly, although the Court has meticulously analyzed and rejected CSX's overreaching position concerning the scope of 23 U.S.C. § 409, (Docs. 101, 124), CSX continues to press the point. (Doc. 138 at 31–32). No good purpose would be served by once again detailing each of the myriad reasons that CSX's positions are baseless. For the third and final time, the Court holds that federal law does not preempt any claim for negligent or wanton delay that Alabama law may provide and that Section 409 does not extend

further than detailed in the Court's prior orders.

18. While the defendants have placed into evidence the "Supplemental Agreement" between CSX and ADOT entered April 1995, (Doc. 135, Exhibit 4A), they have not placed into evidence the July 1980 "Master Agreement" to which the Supplemental Agreement is subject nor the March 1981 amendment to the Master Agreement. These missing documents presumably are relevant both to the nonfeasance-misfeasance issue and to whether CSX breached the contract.

reasonable reliance by the promisee [here, ADOT] on the promisor [here, CSX] to render the services promised." *Prosser & Keeton on Torts* § 93 at 671 (5th ed.1984). This rule may explain the result in *Western Union Telegraph v. Jackson, supra,* in which a third party, a stranger to the contract, was allowed to sue for negligent delay in delivering a telegram pursuant to contract.

With respect to breach of duty, CSX has not established that the limits of any duty to third parties in tort are necessarily coterminous with the limits of the defendant's contractual duty. Even had CSX done so, the contract's failure to specify a time for installation of active warning devices does not prove that CSX did not breach its contractual duty: "When a contract states that an act is to be done but no time is prescribed for its performance, ... the law requires that the act be done within a reasonable time." *Aldridge v. Dolbeer,* 567 So.2d 1267, 1268 (Ala.1990). There are numerous fact issues in this case touching on whether two years from authorization constituted a reasonable time. That ADOT, a very interested party to this litigation, professes not to mind that CSX took two years does not establish that two years was a reasonable time.

CSX suggests that there must be no cause of action for negligent delay in installing warning devices at railroad crossings because no court has ever held that there is one. Given the courts' inability to rule on such questions until and unless properly presented by the parties, such silence would be ambiguous at best. At any rate, in only a few minutes of non-exhaustive research the Court located *Hebert v. Missouri Pacific Railroad Co.,* 366 So.2d 608 (La.App.1978), which held that "the unreasonable delay in the railroad's installation of the safety devices *was* negligent." *Id.* at 611. Similar cases may well remain to be located.

The foregoing discussion is neither an exhaustive catalog of the issues governing CSX's motion for summary judgment that have been inadequately addressed nor a complete rendition of all the legal and factual material casting doubt on CSX's position. It is, however, sufficient to demonstrate that there are "novel or complex" issues of state law embedded in CSX's motion which deserve resolution by an Alabama jurist.

In summary, the Court concludes that, given the dismissal of the plaintiffs federal claims and the novel and complex nature of her state law claim for negligent or wanton delay, the plaintiffs supplemental state law claims should be remanded to state *court. See Lewis v. City of St. Petersburg,* 260 F.3d 1260, 1267 (11th Cir.2001)(when a court declines to exercise supplemental jurisdiction over a case removed from state court, the claims should be remanded rather than dismissed).

## CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by ADOT, Rushing in his official capacity and Rushing in his individual capacity is granted in its entirety. The motion for summary judgment filed by the City is granted with respect to Counts Three, Four, Five, Six, Seven and Eight. The motion for summary judgment filed by defendants CSX, Owens and Cooper is granted with respect to Counts Three, Four, Five, Six, Seven and Eight. Pursuant to 28 U.S.C. § 1367(c)(1) and (3), the remaining portions of this action are remanded to the Circuit Court of Escambia County. Judgment shall be entered accordingly by separate order.