**Edward R. TEITEL, et. al., Plaintiffs,**

v.

**WAL–MART STORES, INC., Defendant.**

No. CIV.A. 02–A–1054–S.

United States District Court, M.D. Alabama, Southern Division.

Oct. 20, 2003.

J. Timothy Coyle, J. Tim Coyle, P.C., Birmingham, AL, for Plaintiffs.

Dorman Walker, Balch & Bingham, Montgomery, AL, Scott Borden Grover, James Aubrey Bradford, Balch & Bingham, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Drs. Edward R. Teitel, David Drennen, and Chris Classen ("the Plaintiffs") on July 23, 2003 (Doc. # 28), and a Motion for Summary Judgment filed by Wal-Mart Stores, Inc.

("the Defendant" or "Wal–Mart") on July, 24 2003 (Doc. # 30).

The Plaintiffs filed their Complaint before this court on September 13, 2002. The Plaintiffs raise claims for continuous trespass (Count I), negligence (Count III),[1] willful and wanton conduct (Count IV), tortious interference with business relations (Count V), fraud (Count VI), and breach of contract (Count VII). This court's jurisdiction is based upon diversity and exercised pursuant to 28 U.S.C. § 1332.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the non-

moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In resolving the present cross-Motions for Summary Judgment the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. *Barnes v. Southwest Forest Industries,* 814 F.2d 607, 609 (11th Cir.1987).

## III. FACTS

The submissions of the parties establish the following:

James Rudd owned property adjacent to U.S. Highway 231 in Dale County, Alabama, within the city limits of Ozark, Alabama. He divided this land into two parcels, selling the parcel closest to the highway to Wal–Mart. In January of 1994, Mr. Rudd and Wal–Mart entered into a Reciprocal Passage Easement Agreement that provided for a vehicular

---

1. The Plaintiffs have withdrawn their request for a preliminary injunction (Count II) and now seek a mandatory injunction. "The Plaintiffs acknowledge that a preliminary injunction requiring Wal–Mart to refrain from interfering with the Reciprocal Passage Easement is impractical given the fact that Wal–Mart's unilateral movement of the easement

is complete. The Plaintiffs, however, at this point, request the Court to grant a mandatory injunction, ordering the Defendant to return the property to the condition it was in before the easement was destroyed." Plaintiff's Amended Brief in Support of Motion for Summary Judgment at 8.

and pedestrian easement on both parcels of land.

Mr. Rudd later sold the 18 acre back parcel, which was farther removed from the highway to the Ozark Physicians Group, L.L.C. (OPG). The Plaintiffs, who were principals in OPG, personally guaranteed a note in order to secure a mortgage for the back parcel. In selecting a location, OPG considered several properties. The group decided to purchase the back parcel for a number reasons, including proximity to the high traffic volume of U.S. Highway 231, placement upon a berm that provided for good visibility of the site, and the presence of an access road or easement that was built from U.S. Highway 231 to the site. The group planned to use this site for a multi-speciality clinic, which was designed to compete with medical facilities in Dothan and Montgomery.

That was the plan, however, two of the physicians employed by OPG began embezzling company funds. They were convicted, and OPG went bankrupt defaulting on its note, leaving the Plaintiffs responsible as the personal guarantors of the loan. According to the Defendant, the Plaintiffs "paid off the debt owed by OPG to Community Bank [ & Trust of Southeast Alabama] and received an assignment from the bank of the OPG note and mortgage." Defendant's Memorandum of Law in Support of Motion for Summary Judgment at 5. The Plaintiffs assert that for the Bank "to be able to force the Plaintiffs to exercise their personal guarantees, [it] had to officially foreclose on the property, offering the site at a public auction on the Dale County Courthouse steps." Plaintiffs' Brief in Support of Motion for Summary Judgment at 4–5.

The Plaintiffs hired the law firm of Burr & Forman to represent them in matters relating to a foreclosure sale to be held on July 22, 2002. Before the auction, the firm became aware that Mr. Robert Harry was interested in purchasing the property. The Plaintiffs, who were individually liable on the loan, were "enthusiastic as to Mr. Harry's potential purchase." Complaint at para. 10. While the Plaintiffs were concerned with buyers for the back parcel, Wal–Mart was starting an expansion project at its Ozark store. With the Defendant's local engineer uncertain as to the ownership of the easement/driveway, and with Dr. Drennen, one of the Plaintiffs, contacting the Defendant to claim ownership thereof, Wal–Mart began an investigation. The Defendant hired local counsel, Mary Hawkins of the law firm of Correti, Newsom & Hawkins, to investigate the ownership of the property and driveway. Ms. Hawkins communicated several times with Dr. Drennan and Dr. Teitel. She obtained copies of the Easement Agreement, the deed from Mr. Rudd to OPG, the assignment of the mortgages to the Plaintiffs, and other relevant documents, which she transmitted to Wal–Mart.

When the Plaintiffs learned of Wal–Mart's expansion plans, they were concerned that the Defendant might destroy the driveway/easement to the back parcel before the auction. The Plaintiffs were also concerned that a relocated easement would "cloud the title to the back parcel, ... could make it difficult for large vehicles to traverse[,] ... [that] there would be no access for Mr. Harry or other potential buyers to inspect the property[,] ... [and that] uncertainty [as to] the adequacy of an acceptable replacement could disrupt the property's sale." Complaint at para. 11. Thus, "Plaintiffs [allegedly] notified Wal–Mart, through Wal–Mart's counsel, that the construction on the Ozark store might hurt their chance to sell their property, if Wal–Mart interfered with the easement." Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 9.

In response to the Plaintiffs' concerns about the easement, Ms. Hawkins sent an electronic mail message ("e-mail") to Dr. Teitel, one the Plaintiffs, to notify him that "Wal–Mart has advised me that it will be able to complete the expansion of its store and parking lot in Ozark, Alabama, without disturbing the Reciprocal Passage Easement which traverses its property." Defendant's Exhibit O. Shortly before sending this message to the Plaintiffs, Ms. Hawkins and Mr. Clint Connell, a Wal–Mart real estate manager, communicated regarding whether the easement would be disturbed. One or both of these two parties was arguably confused, misunderstood, or engaged in deception depending upon whose interpretation of events one accepts. Mr. Connell either did or did not tell Ms. Hawkins that the easement would be disturbed. Regardless of what was told to Ms. Hawkins, it is undisputed that after this conversation she assured the Plaintiffs that the easement would not be disturbed. This assurance allegedly proved inaccurate as Wal–Mart destroyed the easement road.

The Plaintiffs, who stated that they were unaware of Wal–Mart's interference with the easement, allegedly continued negotiations with Mr. Harry as to the purchase of the back parcel. The Plaintiffs were confused, when on July 22, 2002, Mr. Harry failed to bid on the property. Dr. Teitel contacted Mr. Harry to seek an explanation. Allegedly, Mr. Harry went by the property before the auction, only to find that the "nice, curbed direct access road had been torn up and destroyed, and there was no way to even get back to see the property." Plaintiff's Brief in Support of Motion for Summary Judgment at 5; see also Plaintiffs' Exhibit 7. After learning that Mr. Harry did not bid because of the condition of the easement, Plaintiffs' counsel in the foreclosure proceeding, Mr. Derek Meek of Burr & Forman, contacted Ms. Hawkins on July 23, 2002.

Ms. Hawkins responded on July 24, 2002, writing the Plaintiffs to inform them that the easement was being relocated. This communication contained materials that showed the existing easement and the route for a new easement, which Wal–Mart would build. The Plaintiffs have been informed that Wal–Mart will complete a new road to the Plaintiffs' property.

## IV. DISCUSSION

The Plaintiffs and Defendant seek summary judgment as to all claims brought before this court. For reasons to be discussed, both the Plaintiffs' and the Defendant's Motions for Summary Judgment are due to be denied as to each claim.

### A. Continuous Trespass

■ "Trespass has been defined as any entry on the land of another without express or implied authority, and a structure maintained on another's property is a continuing trespass." *Garrison v. Alabama Power Co.*, 807 So.2d 567, 570 (Ala.Civ. App.2001). All parties move for summary judgment on this claim. The Defendant advances three arguments as to why summary judgment should be granted to it and not to the Plaintiffs. First, the Defendant argues that the use of the language "maintained from time to time" authorizes relocation of the easement. Second, the Defendant contends that when an agreement fails to expressly prohibit relocation, the servient estate owner retains the authority to relocate the easement. Third, the Defendant argues that the map depicting the easement shows symbols indicating future parking spaces located within the easement; consequently, the parties, according to the Defendant's interpretation, anticipated relocation. The Plaintiffs argue that the terms of the contract unambiguously provide for an easement at a set location

that cannot be unilaterally relocated by the Plaintiff.

The crux of the dispute between these parties relates to differing interpretations of the Reciprocal Passage Easement Agreement. The agreement provides as follows:

1. That Rudd will have the right for its benefit and the benefit of its successors and assigns, and their invitees, employers, tenants, mortgagees and customers, with respect to Tract 2 as shown on Exhibit A, the right of free passage of vehicular and pedestrian traffic over the driveway maintained from time to time on Tract 1 as indicated by crosshatching on Exhibit A; provided, however, in no event shall the owner, occupant, licensee, or invitee of any of Tract 2 be permitted to use Tract 1 for vehicular parking or for any other purpose other than as described above.

2. That Wal–Mart shall have the right for its benefit and the benefit of its successors and assigns, and their invitees, employees, tenants, mortgagees and customers, with respect to Tract 1, the right of free passage of vehicular and pedestrian traffic over the driveways maintained from time to time on Tract 2 as shown on Exhibit A; provided, however, in no event shall the owner, occupant, licensee or invitee of Tract 1 be permitted to use Tract 2 for vehicular parking or for any other purpose other than as described above.

Plaintiffs' Brief in Support of Motion for Summary Judgment at Exhibit 3.

■ In considering this agreement, the court is to give the words of the contract their ordinary meaning, and the intent of the parties is to be derived from the contract provisions. *Food Service Distribs., Inc. v. Barber,* 429 So.2d 1025, 1028 (Ala.1983). The issue of whether a contract is ambiguous or unambiguous is a question of law. *McDonald v. U.S. Die Casting & Dev. Co.,* 585 So.2d 853, 855 (Ala.1991). "When the terms of a contract are unambiguous, the construction of the contract and its legal effect become questions of law for the court, and when appropriate, may be decided by summary judgment." *Dill v. Blakeney,* 568 So.2d 774, 777–78 (Ala.1990). If only one reasonable meaning emerges, the contract is unambiguous. *Wayne J. Griffin Electric, Inc. v. Dunn Construction Co.,* 622 So.2d 314, 317 (Ala.1993). That parties argue for different constructions of the contract does not itself create ambiguity. *Wayne J. Griffin Electric,* 622 So.2d at 317. If "the terms of a contract are ambiguous in any respect, [then] the determination of the true meaning of the contract is a question of fact for the jury." *Dill v. Blakeney,* 568 So.2d at 778. The court, however, "will not insert ambiguities into a contract by giving strained and twisted meanings to its terms, where no such ambiguities exist." *ERA Commander Realty, Inc. v. Harrigan,* 514 So.2d 1329, 1334 (Ala.1987).

■ The Defendant asserts that "by using the word 'maintained,' as modified by the phrase 'from time to time,' in the Easement Agreement, the parties signified the reciprocal ability of each to locate and relocate the driveways to be used for the access easements." Although conceding that "some Alabama appellate decisions have ... interpreted the word 'maintain' to mean 'keep up' or 'keep in good repair,'" the Defendant cites the case of *Romar Development Co. v. Gulf View Management Corp.* in support of its argument that the phrase can empower a party to relocate an easement. Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 12. *Romar* does not, however, support the Defendant's contention; quite to the con-

trary, the case supports the Plaintiffs' argument.

The Alabama Supreme Court in *Romar* modified an errant ruling by a trial court that failed to accurately describe the location of an easement in its order. *Romar Development Co. v. Gulf View Management Corp.,* 644 So.2d 462, 466 (Ala.1994). The court modified the order so that the easement would fit within the parameters defined by the contract. *Id.* The contract provided for the easement to be a "60–foot wide strip of land, which strip runs along the Western boundary of the Property from Alabama Highway 192 Northerly to the Northwest corner of the Property." *Id.* at 463. The court found that "this provision *clearly* and *unambiguously* describes a 60–foot wide strip of land running generally north and south in a line *bordering the west side* of Gulf View Square." *Id.* at 465. Consequently, the court determined that the contract "neither requires, nor, indeed permits, judicial construction." *Id.* 465. Although the court indicated that the term "maintain," as used by the trial court, did mean "provide for," this does not advance the Defendant's contention that *Romar* supports an understanding of the word "maintain" or "maintain" joined with "from time to time" as empowering a party to relocate an easement. *Id.* at 467. *Romar* actually stands for the opposite conclusion, keeping an easement within the exact boundaries as described in a contract, rather than permitting it to be relocated. *Id.* at 466.

The Defendant argues that the failure of the contract to expressly prohibit relocation of the easement results in the servient estate owner retaining the power to move the easement. Pursuant to Alabama law, "the owner of the servient estate may himself use the land upon which an easement has been dedicated so long as such right does not conflict with the purpose and character of the easement."

*Price v. McNeil,* 771 So.2d 1054, 1055 (Ala. Civ.App.2000) (quoting *Carter v. Stringfellow,* 293 Ala. 525, 306 So.2d 273, 276 (1975)). The Defendant's citation to this authority does not settle the issue; rather, it raises the question of whether the ability to relocate an easement is within the character of an easement obtained through an express grant or reservation. "As respects easements by express grant or reservation, there is a firm rule that where the language of the grant does not definitely locate the route of the easement, and the parties adopt a route by agreement or user, the route so adopted may not later be relocated without the consent of the parties." F.M. English, Annotation, *Relocation of easements (other than those originally arising by necessity); rights as between private parties,* 1961 WL 13063, 80 A.L.R.2d 743 § 2 (1961). Therefore, "if the grant definitely prescribes the course of the easement, neither party can change such course without the consent of the other." *Id.; see also* MILTON R. FRIEDMAN & JAMES CHARLES SMITH, FRIEDMAN ON CONTRACTS AND CONVEYANCES OF REAL PROPERTY § 4.9 (2001); 25 Am.Jur.2d *Easements and Licenses in Real Property* § 79 (2003).

The Restatement (Third) of Property (Servitudes), however, takes a dramatically different approach, rejecting the traditional and still majority rule that a servient estate owner without express authorization from the contract may not unilaterally relocate an easement. RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.8 (2000). The Restatement advances the rule that the Defendant seeks to have this court apply, which is that silence as to the ability of a party to relocate an easement translates into power of the servient landowner to, under certain circumstances, move the easement unilaterally. *Id.* The Restatement provides as follows:

(3) Unless expressly denied by the terms of an easement, as defined in

§ 1.2, the owner of the servient estate is entitled to make reasonable changes in the location or dimensions of an easement, at the servient owner's expense, to permit normal use or development of the servient estate, but only if the changes do not

(a) significantly lessen the utility of the easement,

(b) increase the burdens on the owner of the easement in its use and enjoyment, or

(c) frustrate the purpose for which the easement was created.

*Id.*[2]

This view, however, does not conform with Alabama law. Although Judge Crawley, writing in dissent in *Arp v. Edmonds,* advocated the adoption of a rule allowing the servient estate owner to relocate the easement without the consent of the easement holder, the Alabama Court of Civil Appeals declined to adopt such a rule. *Arp v. Edmonds,* 706 So.2d 736 (Ala.Civ. App.1997). In *Arp,* the owner of the servient estate was able to increase the value of his property while providing an adequate alternate route in place of the original easement. *Id.* at 737–739. Nevertheless, the court found that the trial court should have granted the easement holders' request for injunctive relief, thus preserving the traditional rule and failing to adopt the rule advocated by the Defendant, the dissent, and the Restatement. *Id.* at 739.

■ The Defendant argues that symbols on the map,[3] which display the original location of the easement, represent future parking spots within the easement, thus the Defendant contends that the par-

ties anticipated relocating the easement at some future date. Defendant's Reply in Support of Its Motion for Summary Judgment at 6. Three symbols appear inside the easement that as interpreted by Defendant denote future parking spots. *Id.* at Exhibits 2–4. Consequently, the Defendant argues that the two parties to the contract "clearly contemplated the future relocation of the driveway depicted on Exhibit A. To contend otherwise is to say that Wal–Mart and Rudd agreed to reciprocal grants of access, while simultaneously agreeing Wal–Mart could at some future time obstruct Rudd's access by inserting parking spaces in accordance with the specifications in Exhibit A." *Id.* at 6.

Plausible explanations exist other than that the Defendant anticipated expanding its parking lot and retained the right to relocate the easement. One such explanation is that Wal–Mart conveyed to the Plaintiffs the right to an easement located where the cross-hatching is marked on the map and did not retain the authority to build a parking lot on that location. These markings, nevertheless, provide substantial evidence sufficient to create ambiguity as to the meaning of the contract. The court finds that the contract is ambiguous in that respect and that the true meaning of the contract is, therefore, a question of fact for the jury. The Plaintiffs' and Defendant's Motions for Summary judgment are due to be denied as to the claim of continuous trespass.

### B. Mandatory Injunction

The Plaintiffs initially in their complaint sought a preliminary injunction; however, they have rescinded this request.[4] "The

---

**2.** *See generally* Note, *The Right of Owners of Servient Estates to Relocate Easements Unilaterally,* 109 Harv L. Rev. 1693 (1996) (offering a critique of the Restatement approach).

**3.** The map is Exhibit A of the Reciprocal Easement Agreement.

**4.** The court Denied the Plaintiffs' request for a preliminary injunction in an order issued on September 24, 2003 (doc. # 49).

Plaintiffs acknowledge that a preliminary injunction requiring Wal–Mart to refrain from interfering with the Reciprocal Passage Easement is impractical given the fact that Wal–Mart's unilateral movement of the easement is complete. The Plaintiffs, at this point, request the Court to grant a mandatory injunction, ordering the Defendant to return the property to the condition it was in before the easement was destroyed." Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 8. The Defendant argues that the court should reject the Plaintiffs' Summary Judgment Motion for an injunction because the Plaintiffs submitted their request more than a month after the deadline for moving this court for an amendment to the pleadings and because Wal–Mart acted properly. Since the only injunction sought in the Complaint is a preliminary injunction and that claim has been abandoned and denied, the motions for summary judgment in regard to an injunction are due to be denied as moot.

## C. Negligence and Wantonness

The Plaintiffs raise claims of negligence and wantonness. "The elements of a negligence claim are a duty, a breach of that duty, causation, and damage." *Armstrong Bus. Services, Inc. v. AmSouth Bank,* 817 So.2d 665, 679 (Ala. 2001). The Plaintiffs allege that the Defendant acted negligently in failing to review or adequately review the ownership of the easement before beginning construction. Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 8–9. The Plaintiffs assert that the Defendant negligently moved forward with construction even though, it was "put on actual notice by the Plaintiffs that their interests would be jeopardized by any interference with the Reciprocal Passage Easement." *Id.* at 9. To demonstrate wantonness, the Plaintiff must "prove that the defendant caused harm by the conscious doing of some act or the conscious omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury would likely or probably result." *Kmart Corp. v. Peak,* 757 So.2d 1138, 1144 (Ala.1999). The Plaintiffs argue that they made the Defendants aware "that the construction on the Ozark store might hurt their chance to sell their property, if Wal–Mart interfered with the easement." Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 9.

The Plaintiffs seek summary judgment both for negligence and wantonness. The Defendant, however, argues that it is entitled to summary judgment on both claims because Wal–Mart "researched the ownership issues in connection with the Easement Agreement and Plaintiffs' property and ultimately acted in consideration of and consistent with both under the terms of the Easement Agreement." Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 15. The Defendant argues that the Plaintiffs have effectively conceded "their negligence claim, [by] admitting that Wal–Mart researched the issues surrounding the Easement Agreement ... for 'almost one month.'" Defendant's Reply in Support of its Motion for Summary Judgment at 9 n. 6. Nevertheless, with regard to the negligence claim, viewing the facts in a light most favorable to each party, one could conclude that the Defendant acted either properly or improperly in altering the easement or researched adequately or inadequately the ownership rights in this easement. Similarly, with regard to the wantonness claim, one could conclude that the Defendant acted properly or improperly or with or without knowledge of the probability of causing harm. Consequently, the Plaintiffs' and Defendant's Motions for Summary Judgment are due to be

denied as to the claims of negligence and wantonness.

## D. Tortious Interference with Business Relations

■ Under Alabama law, to establish the tort of interference with contractual or business relations, a plaintiff must prove: 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference with the contract or business relation, 4) the absence of justification for the defendant's interference, and 5) damage to the plaintiff as a result of the interference. *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala.2002). "Justification has been recognized both as an element to be proved by the plaintiff and as an affirmative defense to be pleaded and proved by the defendant." *Id.*

The Alabama Supreme Court indicated that "the tort of intentional interference with business relations was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties ... affects the relationship of one of the parties with a third party." *Cahaba Seafood, Inc. v. Central Bank of the South*, 567 So.2d 1304, 1306 (Ala.1990). The court, however, found allegations of interference with business relations involving a third party to be sufficient to distinguish a case that involves exclusively a breach of contract dispute from one that involves interference with business relations. *Joe Cooper & Assocs., Inc. v. Central Life Assur. Co.*, 614 So.2d 982, 987 (Ala.1992) (noting that "the plaintiffs alleged that Central intentionally interfered with the business relations between the plaintiffs and their PET clients, not the contract between JCIM and Central. Consequently, our holding in *Cahaba Seafood* does not apply to the facts of this case."). The

Plaintiffs contend that Wal–Mart interfered with their business relations with Mr. Harry; thus, *Cahaba Seafood* does not apply to the facts of this case.

The Defendant asserts that the relationship between the Plaintiffs and Mr. Harry was insufficient to constitute a business relationship, because Mr. Harry had no obligation to bid on the property, and the Plaintiffs had no obligation to sell the property to him. Defendant's Amended Memo at 17. Essentially, the Defendant argues that "[Mr.] Harry's inquiries to the Plaintiffs' attorneys handling the foreclosure sale are far too tenuous and speculative to create a cause of action in Plaintiffs for interference." *Id.* The Defendant advances *Ex parte Ala. Dept. of Transp.* as authority for this proposition. *Id.*

The Alabama Supreme Court's analysis and holding in *Ex parte Ala. Dept. of Transp.* does fully not support the Defendant's proposition. *Ex parte Ala. Dept. of Transp.*, 764 So.2d 1263, 1270–71 (Ala. 2000). The court in distinguishing *Spring Hill Lighting & Supply Co. v. Square D Co.*, 662 So.2d 1141 (Ala.1995) noted that the subcontractor's bid in that case had already been accepted by the general contractor before the outside interference occurred. *Id.* at 1270. Thus, the court indicated that the *Spring Hill* case presented parties with more "maturity" in their economic relationship and "a legitimate expectancy of the formation of a contract before the alleged tortious act occurred." *Id.* at 1270–71. The court in *Ex parte Ala. Dept. of Transp.* indicated that "the undisputed evidence suggests that, when ALDOT [(Alabama Department of Transportation)] amended its specifications to effectively exclude the use of chert gravel on Alabama roads, the State of Alabama had not awarded any road–construction contracts to any general contractor that had relied on Blue Ridge's bid as a subcontrac-

tor." *Id.* at 1270. The court further reasoned that "if the State awards a contract to a general contractor that has not relied on a bid by Blue Ridge, then that general contractor would not need Blue Ridge to supply materials." *Id.* Because the plaintiff had no reasonable expectation that a general contractor that had already agreed to buy from another subcontractor would switch to the plaintiff or that a general contractor that had not been awarded a contract would buy gravel from them, the court concluded that the plaintiff "did not have a reasonable expectancy of the formation of a contract for it to supply gravel that would not have met the new requirements." *Id.* Therefore, the court found that the Alabama Department of Transportation did not interfere with existing business relations. *Id.* at 1270–71. This relationship between the Plaintiffs and Mr. Harry falls squarely between the mature economic relationship and reasonable expectation of forming a contractual relationship in *Spring Hill* and the improbability and the lack of a reasonable expectation of forming a contract in *Ex parte Ala. Dept. of Transp.*

The Alabama Supreme Court indicated that "defining this cause of action to apply to a 'business relation' as well as a 'contractual relation' allows a plaintiff a remedy in the situation where a defendant has intentionally interfered with a prospective contract ...." *Ex parte Ala. Dept. of Transp.,* 764 So.2d at 1270 (citing RESTATEMENT (SECOND) OF TORTS, § 766B cmt. b (1979)). The court noted that "this rule has always been justified by the policy that 'protection is appropriate against im-

proper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.'" *Ex parte Ala. Dept. of Transp.,* 764 So.2d at 1270 (citing RESTATEMENT (SECOND) OF TORTS, § 766 cmt. c (1979)). Pursuant to the Restatement (Second) of Torts, "relations protected against intentional interference ... include any prospective contractual relations, if the potential contract would be of pecuniary value to the plaintiff." RESTATEMENT (SECOND) OF TORTS § 766B cmt. c (1979).[5] The comments to the Restatement expressly include within the scope of protected relations "interferences with ... the opportunity of selling or buying land ...." *Id.*

The historical development and rationale of this tort also points towards a broad understanding of what constitutes a business relation. As early as 1410, Henry IV cautioned that "if comers to my market are disturbed or beaten, by which I lose my toll, I shall have a good action of trespass on the case." RESTATEMENT (SECOND) OF TORTS § 766B cmt. b (1979) (citing 11 Hen. IV 47; *see also* (1356) 29 Edw. III 18). More recently, Professor W. Page Keeton noted that "it has been said that 'in a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a [person] should be protected by the law in the enjoyment of property once it is acquired but left unprotected by the law in his effort to acquire it.'" W. Page Keeton et al., PROSSER AND KEETON ON TORTS § 130 (5th ed.1984). In rejecting the application of a "but for" test that would have re-

---

5. The Alabama Supreme Court has regularly looked to and quoted from the Restatement (Second) of Torts when interpreting a variety of aspects of the tort of interference with contracts or business relations including for the aspect of whether the relationship between the plaintiff and a third party constitutes business relations. *Ex parte Ala. Dept.*

of *Transp.,* 764 So.2d at 1270; *see also Bell-South Mobility, Inc. v. Cellulink, Inc.,* 814 So.2d 203, 219 (Ala.2001); *Barber v. Bus. Prods. Ctr., Inc.,* 677 So.2d 223, 228 (Ala. 1996); *Bear Creek Enters., Inc. v. Warrior & Gulf Nav.,* 529 So.2d 959, 961 (Ala.1988); *Harrell v. Reynolds Metals Co.,* 495 So.2d 1381, 1388 (Ala.1986).

quired a plaintiff to prove that the contract would have been awarded if not for the interference, the Alabama Supreme Court indicated that the tort of interference with business relations "is designed to protect property interests in businesses and to compensate for the damage caused by that interference. It is the right to do business in a fair setting that is protected." *Utah Foam Prods., Inc. v. Polytec. Inc.*, 584 So.2d 1345, 1353 (Ala.1991). Viewing this tort within this framework, this court is unprepared to find as a matter of law that the relationship between the Plaintiffs and Mr. Harry did not constitute a business relationship.

The Defendant argues that summary judgment is warranted because it was unaware of the business relationship between the Plaintiffs and Harry. The tort of interference with prospective contractual relations does not require that a tort-feasor have knowledge of a specific third person whom its misconduct prevented from entering into a business relation with the plaintiff. *Kelly–Springfield Tire Co. v. D'Ambro*, 408 Pa.Super. 301, 596 A.2d 867, 871 (1991). Although a defendant may argue that lack of knowledge of the identity of the party to the business relationship "precluded the requisite knowledge of the prospective contractual [or business] relationship[,][t]here is no basis in law or logic for this conclusion[.][A]ll that is necessary is that the tortfeasor know that *some* party or parties had a prospective contractual relationship." *Verkin v. Melroy*, 699 F.2d 729, 733 (5th Cir.1983). The Plaintiffs assert that they contacted the Defendant because of concerns about interference with their easement. They claim to have notified "Wal–Mart, through Wal–Mart's counsel, that the construction on the Ozark store might hurt their chance to sell their property, if Wal–Mart interfered with the easement." Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 9. The

Defendant responded in part through an e-mail from Ms. Hawkins to the Plaintiffs that indicated that "Wal–Mart has advised me that it will be able to complete the expansion of its store and parking lot in Ozark, Alabama, without disturbing the Reciprocal Passage Easement which traverses its property." Plaintiffs' Brief in Support of Motion for Summary Judgment at Exhibit 5. A letter from Hawkins to George Basco in the Wal–Mart Stores Legal Department demonstrates the Defendant's awareness that "the doctors who took the assignment of the Note and Mortgage will be instituting foreclosure proceedings shortly." Defendant's Memorandum of Law in Support of Motion for Summary Judgment at Exhibit N. The Plaintiffs' testimony regarding their communications with the Defendant and the Defendant's understanding that foreclosure proceedings were going to be commenced shortly provide a sufficient basis to raise an issue of fact with regard to whether the Defendant was aware of business relations between the Plaintiffs and some third party, even if they were unaware of the relationship with Harry specifically.

The Defendant argues that summary judgment is due because it possessed the right to relocate the easements, thus its actions were justified. Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 18. For the reasons detailed in other portions of this opinion, the court concludes that summary judgment is not warranted on this basis. The Plaintiffs contend that the Defendant waived the defense of justification by failing to plead it. Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 10–11. The Defendant asserts that it did plead justification and to the extent that its pleading is deficient that the Plaintiffs, nevertheless, must still prove the absence of justification.

Defendant's Response to Brief in Support of Plaintiffs' Motion for Summary Judgment at 15 n. 8. While earlier Alabama Supreme Court cases included justification as an element of the tort, it has now been held that "[j]ustification for interference with contractual or business relations is an affirmative defense to be pleaded and proved by the defendant." *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala.2002). Justification, however, is a "broad[ ] concept, susceptible of application in a wide variety of circumstances." *BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So.2d 203 (Ala. 2001). The Defendant pleads in its Fifth Affirmative Defense as follows: "Wal-Mart asserts that the acts or omissions, if any, of which Plaintiffs complain were reasonable, were done in good faith, and were neither willful, malicious, nor done in a reckless and/or knowing manner." Answer at para. 45. If it is determined that Wal-Mart had the right to act as it did under the contract, the Plaintiffs cannot prevail, and this claim will not turn on an issue of pleading justification or lack thereof.

 In addition to the five elements that a plaintiff must establish for the tort of interference with contracts or business relationship, the plaintiff "must [also] produce substantial evidence of fraud, force, or coercion, on the defendant's part." *Barber v. Bus. Prods. Ctr., Inc.*, 677 So.2d 223, 227 (Ala.1996); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1292 (11th Cir.2001) (incorporating fraud, force, and coercion limitation into analysis of interference with business relations claim arising under Alabama tort law); *see also Joe Cooper*, 614 So.2d at 986 (providing a series of citations for the long history of the application of this limitation to claims for intentional interference). Al-though some states have removed this limitation, the tort of interference with business relations in Alabama adheres more closely to the traditional understanding, which "seems to have developed at a very early date in cases having to do with the use of physical violence, or threats of it, to drive away customers from the plaintiff's market." W. Page Keeton et al., PROSSER AND KEETON ON TORTS § 130 (5th ed.1984). Although Alabama law no longer requires such threats, it, nevertheless, requires fraud, force, or coercion. *Joe Cooper*, 614 So.2d at 986. For the reasons to be discussed in the section of this opinion relating to the Plaintiffs' fraud claim, the court concludes that viewing the evidence in a light most favorable to the Plaintiffs, the Plaintiffs do provide substantial evidence that fraud on Defendant's part interfered with their relationship with Harry.[6] The Plaintiffs' and Defendant's Motions for Summary Judgment on the claim of tortious interference with business relations are due to be denied.

### E. Fraud

 , The Plaintiffs contend that the Defendant committed fraud. Under Alabama law, the tort of fraud requires: (a) a false representation usually concerning an existing material fact; (b) a representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge; (c) reliance by the plaintiff on the representation and that he was deceived by it; (d) reliance which was justified under the circumstances; and (e) damage to the plaintiff proximately result-

---

**6.** The Plaintiffs do not allege that the Defendants used force or coercion to interfere with their relations with Harry.

ing from his reliance. *Cato v. Lowder Realty Co.,* 630 So.2d 378, 381–82 (Ala. 1993).

Although the Plaintiffs raise their claims in terms of misrepresentation, under Alabama law, "claims [that] involve a promise to engage in, or refrain from engaging in, future conduct, ... more accurately allege promissory fraud" than misrepresentation or deceit. *Waddell & Reed. Inc. v. United Investors Life Ins. Co.,* No. CV–00–2720, 2003 WL 22064071, at *13 (Ala.2003); *see also Ex parte City of Gadsden,* 718 So.2d 716, 721 (Ala.1998) (finding that "even if ... [a] letter is characterized as containing a false representation as to [the defendant's] existing legal position, [the plaintiff's] claim is nonetheless based on allegations that [the defendant] falsely represented in the letter that he would abstain from some act in the future .... Such a claim is unquestionably one of promissory fraud."). The Plaintiffs assert that "after Wal–Mart's assurance that they would not disturb the easement and unbeknownst to the Plaintiffs, before the day of the auction Wal–Mart ... completely destroyed the easement." Complaint at para. 15. The Plaintiffs' claim for fraud arises from the assurances of Wal–Mart's counsel that the Defendant would refrain from some future conduct, that future conduct being interference with the Plaintiffs' easement. Brief in Support of Plaintiffs' Motion for Summary Judgment at 11–12. Consequently, under Alabama law, Plaintiffs' claim is more appropriately characterized as an assertion of promissory fraud, rather than misrepresentation.

"To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: ... proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and ... proof that the defen-

dant had an intent to deceive." *Padgett v. Hughes,* 535 So.2d 140, 142 (Ala.1988); *see also Byrd v. Lamar,* 846 So.2d 334, 346 (Ala.2002) (indicating that "a reckless misrepresentation cannot constitute fraud where the alleged misrepresentation relates to some future event. Where the misrepresentation relates to some future event, it must be shown that the person making the representation intended not to do the act promised at the time the misrepresentation was made."). The Defendant argues that the Plaintiffs' only evidence to support a finding of intentional deception is the failure of Wal–Mart to act in accordance with the assurances that Ms. Hawkins, Wal–Mart's local counsel, gave to Dr. Teitel. Response to Brief in Support of Plaintiffs' Motion for Summary Judgment at 16–17. The Defendant asserts that as a matter of law such proof is insufficient to support a claim of fraud. *Id.* at 17.

Under Alabama law, a plaintiff has the burden to prove with substantial evidence that when the defendant made the promise he or she intended to deceive. *Goodyear Tire & Rubber Co. v. Washington,* 719 So.2d 774, 776 (Ala.1998). This burden is not met merely by showing that the promise ultimately was not kept. To allow such proof to be sufficient would render any breach of contract fraudulent. *Id.* "While the mere failure to perform the promised act is not by itself sufficient evidence of fraudulent intent, for purposes of a promissory-fraud claim, the fact-finder may consider that failure, together with other circumstances, in determining whether, at the time the promise was made, the promisor intended to deceive." *Byrd,* 846 So.2d at 343.

The Plaintiffs offer two circumstantial evidence based arguments to bolster their claim of fraud. The first argument asserted by the Plaintiffs is that Wal–Mart en-

gaged in a "double deception." Plaintiffs' Response to Defendant's Motion for Summary Judgment at 2–5. The first part of the alleged deception was the e-mail sent from Ms. Hawkins to Dr. Teitel on June 10, 2002, which indicated that Wal–Mart would not disturb the easement. *Id.* at 4–5; Brief in Support of Plaintiffs' Motion for Summary Judgment at Exhibit 5. The second part was Ms. Hawkins "method" of communication to the Plaintiffs on July 24, 2002, particularly her use of the term relocate and reference to a new road. Plaintiffs' Response to Defendant Motion for Summary Judgment at 3, 5. The harm that Plaintiffs allege that they suffered as a result of the Defendant's allegedly fraudulent conduct, however, occurred on July 22, 2002 when Mr. Harry failed to bid on the Plaintiffs' property. Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 11–12. Burr & Forman, the law firm representing the Plaintiffs in this auction, learned on July 23 that Mr. Harry did not bid, allegedly because the easement road had been destroyed. This court fails to find the logic in the Plaintiffs' argument that Ms. Hawkins letter of July 24, 2002 bolsters their claim that Ms. Hawkins intended to deceive the Plaintiffs in her electronic message that was sent on June 10, 2002. Even assuming arguendo that Ms. Hawkins was attempting to deceive the Plaintiffs with regard to what was occurring on July 24, 2002 to the Plaintiffs' easement, the letter of July 24, 2002 does not provide circumstantial evidence that the Defendant's communication on June 10, 2002, which is the alleged fraudulent act, was intentionally deceptive.

■ The Plaintiffs offer an additional argument that references what is allegedly circumstantial evidence of intentional deception. The Plaintiffs argue that a conversation between Mr. Connell and Ms. Hawkins bolsters their claim that the Defendant acted fraudulently. Plaintiff's Response to Defendant Wal–Mart's Motion for Summary Judgment at 11. Shortly before sending an e-mail to the Plaintiffs, Ms. Hawkins and Mr. Clint Connell, a Wal–Mart real estate manager, communicated regarding whether the easement would be disturbed. *Id.* at 11; *see also* Defendant's Exhibit M. There is some discrepancy as to what exactly was said and understood, between Ms. Hawkins and Mr. Connell, in this conversation. *Id.* Viewing the facts in the light most favorable to the Plaintiffs, one could conclude that Mr. Connell did inform Ms. Hawkins that the Defendant's actions would interfere with the Plaintiff's easement and that there was deception, not confusion, behind the subsequent communication between Ms. Hawkins and Dr. Teitel. Consequently, sufficient surrounding circumstantial evidence exists to provide substantial evidence that the Defendant engaged in intentional deception.

· Even assuming its behavior was intentionally deceptive, the Defendant contends summary judgment is warranted because the Plaintiffs cannot prove that they relied upon or were harmed by this fraud. Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 18–20. The Plaintiffs argue that they relied upon the Defendant's assurances in not seeking an injunction to prevent the Defendant from destroying the easement. Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 11–12. The Defendant argues that because Wal–Mart retained the authority to relocate the easement, the Plaintiffs could not have shown a "substantial likelihood of success on the merits." Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 19. As previously indicated, summary judgment is not appropriate with regard to whether the Defendant acted within its authority in relocating the easement.

The Defendant argues that any reliance/damage that the Plaintiffs demonstrate through failing to seek an injunction creates "Article III standing questions." Defendant's Amended Memorandum of Law in Support of Motion for Summary Judgment at 19 n. 10. The Defendant contends that the Plaintiffs were assignees of the mortgage, rather than successors or assigns as those terms are used in Easement Agreement. *Id.* "Assuming [the Plaintiffs] had received knowledge of the relocation and had acted upon such knowledge, they would not have foreclosed on the mortgage, and thus would not have been actual successors or assigns of the Easement Agreement capable of enforcing its terms." *Id.* For a party to have standing, there must be 1) an injury in fact that is a) concrete and particularized and b) actual or imminent, not conjectural or hypothetical, 2) a causal connection between the injury and the conduct complained of that is fairly traceable to the defendant, not a third party, and 3) likelihood that the injury is capable of being redressed through a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Viewing the facts in the light most favorable to the Plaintiffs, there is an actual concrete particularized diminished property value or loss of financial gain that the Plaintiffs have suffered because of the Defendant's alleged fraudulent behavior that can be redressed through a favorable decision. Although the facts surrounding the foreclosure and the status of the mortgage are not entirely clear, the Plaintiffs do have Article III standing.

The Plaintiffs' and the Defendant's Motions for Summary Judgment are due to be denied on the fraud claim.

## F. Breach of Contract

Under Alabama law, "the elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or breach, and (4) damage." The Plaintiffs argue that the Reciprocal Passage Agreement was a valid binding contract upon these parties, that the plaintiffs performed, that the defendant did not perform, and that they suffered damage. Plaintiffs' Amended Brief in Support of Motion for Summary Judgment at 12–13. The Defendant argues that the Plaintiff did not perform their part of the contract and that it did not breach the easement agreement. Defendant's Response to Brief in Support of Plaintiffs' Motion for Summary Judgment at 18–19. Both parties move for summary judgment. Their arguments mirror those addressed with regard to other issues. For reasons previously indicated, the Plaintiffs' and Defendant's Motions for Summary Judgment are due to be denied on this claim.

## V. CONCLUSION

For the reasons discussed, the court determines that the Plaintiffs' Motion for Summary Judgment is due to be DENIED. The court also determines that the Defendant's Motion for Summary Judgment is due be DENIED. This case will move forward on Count I, Count III, Count IV, Count V, Count VI, and Count VII. In accordance with this Court's earlier Order, Count II has been dismissed. Accordingly, it is hereby ORDERED:

1. Edward R. Teitel, David Drennen, and Chris Claassen Motion for Summary Judgment (Doc. # 28) is DENIED.

2. Wal–Mart Stores, Inc.'s Motion for Summary Judgment (Doc. # 30) is DENIED.